Chief Judge Breitel (dissenting).
Relieving the tenant of its negligent failure to exercise its option to renew a lease within the prescribed time upsets established precedent, introduces instability in business transactions, and disregards commercial realities. I therefore dissent.
This case involves an option to renew a lease, not a mortgage foreclosure or an acceleration clause in a lease or mortgage. The categories and applicable precedents are not to be confused.
In a summary holdover proceeding brought by J. N. A. *401 Realty, a landlord, to recover possession of leased commercial premises, tenant, Cross Bay Chelsea, appeals. The Civil Court’s dismissal of the petition, after trial, was affirmed at Appellate Term, but the Appellate Division reversed, one Justice dissenting, and awarded the landlord possession.
At issue is the availability of equitable relief to remedy a commercial tenant’s failure, by the appointed date, to exercise its option to renew a lease when the only explanation is sheer negligence.
The order of the Appellate Division should be affirmed, and the landlord awarded possession. Mere negligence does not justify departing from the rule that notice of intention to exercise an option to renew must be given within the prescribed period. Equitable relief is never justified by the fact alone, always present, that the tenant will suffer some sort of economic detriment.
The record is unusually deficient in many respects. From it, however, may be culled what follows.
In December, 1963, J. N. A. Realty, as owner, leased a newly erected commercial building in Queens County to Victor Palermo and Sylvester Vascellero. The lease agreement consisted of a printed form and a single 12-page rider. According to the rider, the lease extended for 10 years, to begin January 1, 1964, with an option for an additional 10-year term. All that was required, as set forth in paragraph 58 of the 12-page rider, was that the "tenant * * * notify the landlord in writing by registered or certified mail six (6) months prior to the last day of the term of the lease that tenant desires such renewal.”
Shortly thereafter, Palermo and Vascellero assigned the lease to Foro Romano, Inc., a restaurant corporation in which they were the principals. But the restaurant operated at a loss. By late 1967, following undescribed attempts by others, not identified, at the behest of the tenant, and with six years remaining on the initial term, the business was closed down. It was not until February, 1968 that Peter and John Morfogen, principals of the present tenant Cross Bay Chelsea, responded to an advertisement in the New York Times and indicated their interest in purchasing the leasehold and the closed-down business.
The precise details of the initial conversations between the parties cannot be extracted from the record because they are *402 included only in bits and pieces. Apparently, however, the prospective buyer, who at the time of trial was operating four other restaurants in Manhattan, Queens, and Nassau County, was ready to agree only if a 30-year lease could be arranged. To that effect, a meeting of the principals of landlord J. N. A, Foro, and Chelsea was held on March 16, 1968, and a "modification and extension of lease” agreement executed. While the modification agreement provided that the tenant have the "right to renew this lease for a further period of Twenty-Four (24) years, instead of Ten (10) years”, it also continued in full force and effect "[a]ll other provisions of Paragraph #58”, which contained the requirement of six months’ notice of election of the option to renew. The modified lease provided that a portion of the taxes and insurance premiums, and all of the interior repairs, be borne by the tenant. The starting rent reserved in the option was $1,000 per month.
J. N. A.’s principals attended this critical meeting without counsel, although the Chelsea principals, who now claim ignorance of the conditions to exercising the 24-year renewal option, were accompanied by their lawyer and an accountant. The transaction eventually involved a gross price of $155,000, much of it deferred, for the restaurant, fixtures, and the assignment of the leasehold. Of the $155,000, $40,000 was allocated to the chattels and fixtures, and the balance to the leasehold. Chelsea’s lawyer also attended the June 8 closing of the transfer of the modified lease and the sale of the restaurant, following the March 16 lease modification meeting. Between the closing of the lease modification agreement in March, 1968 and the final closing in June, 1968, Chelsea arranged for a liquor license. Also before the June, 1968 closing, Chelsea had invested $15,000 in undescribed improvements in the premises. In short order the restaurant was reopened and was quite successful, or else this litigation woúld never have ensued.
On July 1, 1973, the date the renewal option was to be exercised, no notice or advice of any kind was sent or given to the landlord. It was not until November 16, 1973, some four and a-half months later, that Chelsea, in response to a letter from J. N. A., sent to the landlord a purported notice to exercise the option. J. N. A. refused to recognize the notice, and on March 4, 1974 instituted this holdover proceeding. The record is silent about the intervening period except to indicate that there were negotiations.
*403 To excuse its failure to send a renewal notice by the July 1 deadline and to support a claim to equitable relief, Chelsea asserts that it never received a copy of the 12-page rider attached to the original lease. In addition to the 1968 modification agreement’s reference to the 1963 rider, the entire lease, including that rider, was filed in April, 1968 with the Division of Alcoholic Beverage Control on Chelsea’s preclosing application for a liquor license. While Chelsea contends that the 1963 rider found in the agency’s file must have been taken from an earlier application submission, the trial court resolved this issue of fact in favor of the landlord. The Appellate Division expressly found that Chelsea had knowledge, or at least should be chargeable with notice, of the provisions of paragraph 58 of the 1963 rider requiring six months’ notice to renew.
Chelsea contends that J. N. A.’s representative was on the premises in the summer of 1973, after law day had passed, and failed to comment when he saw that additional improvements were still being made. There is no evidence of what these improvements were, how extensive they were, their value, or whether they were fixed or movable fixtures or equipment. J. N. A. never conceded that the visits had occurred or that such post law day improvements had been made.
Had an honest mistake or similar "excusable fault”, as opposed to what is undoubtedly mere carelessness, occasioned the tenant’s tardiness, absent prejudice to the landlord, equitable relief would be available (e.g., Sy Jack Realty Co. v Pergament Syosset Corp., 27 NY2d 449, 453; Jones v Gianferante, 305 NY 135, 138). At issue, instead, is the availability of equitable relief where the only excuse for the commercial tenant’s dilatory failure to exercise its option to renew is sheer carelessness.
Enough has been said to uncover a common situation. Experienced and even hardened businessmen at cross-purposes over the renewal of a valuable lease term seek on the one hand to stand by the written agreement, and on the other, to loosen the applicable rules to receive ad hoc adjustment of equities and relief from economic detriment. The landlord wants a higher return. The tenant wants to keep the old bargain. Which of the profit-seeking parties in this particular case should prevail as a matter of morals is not within the province of the courts. The well-settled doctrine is that with respect to options, whether they be lease renewal options, *404 options to purchase real or personal property, or stock options, time is of the essence. The exceptions, namely, estoppel, fraud, mistake, accident, or overreaching, are few. Commercial stability and certainty are paramount, and always the dangers of unsolvable issues of fact and speculative manipulation (as with stock options) are to be avoided.
The landlord should be awarded possession of the premises in accordance with the undisputed language and manifested intention of the written lease, its 12-page rider, and modification. It does not suffice that the tenant may suffer an economic detriment in losing the renewal period. Nor does it suffice that the delay in giving notice may have caused the landlord no "prejudice”, other than loss of the opportunity to relet the property or renegotiate the terms of a lease on a fresh basis. Once an option to renew a lease has been conditioned upon the tenant’s giving timely notice, the commercial lessee should not be heard to complain that through carelessness a valued asset has been lost, anymore than one would allow the landlord to complain of the economic detriment to him in agreeing to an improvident option to renew.
The court unanimously accepts the general rule at law: an option to renew a commercial lease must be exercised within the appointed time period (e.g., Sy Jack Realty Co. v Pergament Syosset Corp., 27 NY2d 449, 452, supra,' and authorities cited; see Restatement, Contracts 2d [Tent Draft Nos. 1-7, 1973], § 64, Comment f; 34 NY Jur, Landlord and Tenant, §§ 418-419; 51C CJS, Landlord and Tenant, § 59). Underlying the bar to equitable relief is the theory that until the condition precedent is fulfilled, that is, until the required timely notice is given, there is no "forfeiture” for which equity will extend protection (Fidelity & Columbia Trust Co. v Levin, 128 Misc 838, 844-845, affd 221 App Div 786, affd 248 NY 551; 2 Pomeroy, Equity Jurisprudence [5th ed], § 453b, p 296). While the rule has been bolstered by traditional concepts of estates in land, its basis has current commercial and economic validity.
In this State, as in others, relief has been afforded tenants threatened with loss of an expected renewal period (see, generally, Effect of Lessee’s Failure or Delay in Giving Notice Within Specified Time, of Intention to Renew Lease, Ann., 44 ALR2d 1359, esp 1362-1369). But in New York, as elsewhere, the circumstances conditioning such relief have been carefully limited. It is only where the tenant can show, not mere *405 negligence, but an excuse such as fraud, mistake, or accident, that is, one or more of the categories common and integral to invocation of equity, that courts have, despite the literal agreement and intention of the parties, stepped in to prevent a loss (see, e.g., Jones v Gianferante, 305 NY 135, 138-139, supra; 1 McAdam, Landlord and Tenant [5th ed], § 156, pp 721-722).
Even in the case of excusable default by the tenant the court looks to the investment the tenant has made to bolster his right to equitable relief. But the fact of tenant investment alone is not enough to justify intervention. Thus, in the leading cases excusing the tenant’s late notice, mention is perforce made of investments and improvements (e.g., Sy Jack Realty Co. v Pergament Syosset Corp., 27 NY2d 449, 453, supra; Jones v Gianferante, 305 NY 135, 138, supra). But the loss or "forfeiture” of these investments was not alone the trigger to granting relief. Indispensable is the existence of some mistake or excusable default. Thus, in Jones v Gianferante (supra, p 138), an ambiguous term in the lease excused the tenant’s failure. And in Sy Jack v Pergament (supra, p 453), it was reliance on the post office to deliver the notice, mailed three days before law day, that was forgiven. In no case of accepted or acceptable authority, however, were improvements alone enough to help the negligent tenant.
The majority facilely disposes of the tenant’s delinquency in exercising its option by relying on cases in which a party, notwithstanding its negligence, was relieved from a forfeiture (e.g., Giles v Austin, 62 NY 486, 493-494, a conditional limitation in a lease; Noyes v Anderson, 124 NY 175, 182-183, mortgagor’s failure to pay an assessment). But indiscriminate application of principles evolved to deal with mortgage foreclosures or a lessor’s right to re-enter upon a tenant’s failure to pay taxes and assessments when due does not withstand analysis. Since ever so long, enforcement of a mortgage has rested in equity (see Jamaica Sav. Bank v M. S. Investing Co., 274 NY 215, 219; 38 NY Jur, Mortgages and Deeds of Trust, § 317). It is also significant that as to foreclosure, time is not of the essence (see 10 NY Jur, Contracts, § 270). Even where acceleration clauses are involved and a strong argument can be made for allowing relief, time has been of the essence and negligence has not been excused (see Graf v Hope Bldg. Corp., 254 NY 1, 4, 7 [dissenting opn per Cardozo, Ch. J.]). It is equally inappropriate to analogize to a lessee’s failure to *406 comply with a lease requirement that taxes and assessments be paid as they become due (see Giles v Austin, supra, pp 493-494). For the loss of an existing lease term subject to a condition subsequent distinguishes that situation from the loss of a possible option period subject to a condition precedent. An option is a right to purchase or acquire an interest in personal or real property in the future, and, if precise, it carries an invulnerable requirement to comply with all conditions, including that of time which is therefore of the essence in law and equity.
There are cases, not binding on this court, which express the principles discussed. For reasons that are not persuasive they would distinguish, however, between mere neglect or forgetfulness and gross or willful negligence, whatever that might be (see Fountain Co. v Stein, 97 Conn 619, 626-627; Xanthakey v Hayes, 107 Conn 459, 469; see, generally, 1 Williston, Contracts [3d ed], § 76, p 249, n 4). This is not a distinction generally accepted and is hardly a pragmatic one to apply in an area where the opportunities for distortion and manipulation are so great. The instability and uncertainty would be dangerous and would allow for ad hoc dispensations in particular cases without reliable rule so essential to commercial enterprise.
To begin with, under the guise of sheer inadvertence, a tenant could gamble with a fluctuating market, at the expense of his landlord, by delaying his decision beyond the time fixed in the agreement. The market having resolved in favor of exercising the option, the landlord, even though the day appointed in the agreement has passed, could be held to the return set out in the option, although if the market had resolved otherwise, the tenant could not be held to the renewal period.
None of this is to say that the tenant in this case was guilty of any manipulation. Hardly so. But what the court is concerned with is a rule for this case which perforce must cover other cases of like kind, where there will be no assurance that the "forgetfulness” is no more than that. The worst of the matter is that the kind of paltry record made in this case is hardly one on which a new rule with potential for mischief should be based. When the option, especially one requiring notice well in advance of the expiration of the lease, permits of economic manipulation, in commercial fairness the parties, *407 especially if represented by counsel, should be held to their bargain, if plainly expressed.
Considering investments in the premises or the renewal term a "forfeiture” as alone warranting equitable relief would undermine if not dissolve the general rule upon which there is agreement. For, it is difficult to imagine a dilatory commercial tenant, particularly one in litigation over a renewal, who would not or could not point, scrupulously or unscrupulously, to some threatened investment in the premises, be it a physical improvement or the fact of good will. As a practical matter, it is not unreasonable to expect the commercial tenant, as compared with his residential counterpart, to protect his business interests with meticulousness, a meticulousness to which he would hold his landlord. All he, or his lawyer, need do is red-flag the date on which he has to act.
Having established no excuse, other than its own carelessness, Chelsea’s claim is unfounded. Even if Chelsea honestly thought it enjoyed a 30-year lease, it does not change the result. Nor is it helpful to argue that Chelsea, always represented by a lawyer, was unable to procure a copy of the entire lease agreement. Indeed, it borders on the utterly incredible that experienced, sophisticated businessmen and their lawyers would not have assembled and scrutinized every relevant document affecting a long-term lease covering, with a renewal, a 30-year period.
That adherence to well-settled principles, like a Statute of Limitations or a Statute of Frauds, works a hardship on some does not, alone, permit a court to depart from sound doctrine and principles. Even if precedent did not control the same doctrines and principles discussed should be applied.
Accordingly, I dissent and vote that the order of the Appellate Division should be affirmed, and the landlord awarded possession of the premises.
Judges Gabrielli, Fuchsberg and Cooke concur with Judge Wachtler; Chief Judge Breitel dissents and votes to affirm in a separate opinion in which Judges Jasen and Jones concur.
Order reversed, with costs, and a new trial granted.